# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 7, 2011 Session

## JONATHAN PAUL GRAY v. CASEY RENEA JEANS

**Appeal from the Circuit Court for Hamblen County**
**No. 05CV238      John K. Wilson, Judge**

---

**No. E2011-00692-COA-R3-CV-FILED-JANUARY 25, 2012**

---

Casey Renea Jeans ("Mother") and Jonathan Paul Gray ("Father") are the parents of two minor children, Tyler and Alexia ("the Children", collectively). Mother and Father never were married. As part of the Permanent Parenting Plan ("the PPP"), Mother and Father shared custody of the Children, with Father designated as the primary residential parent. Mother filed a motion in the Circuit Court for Hamblen County ("the Trial Court") to modify the PPP. Specifically, Mother sought to become the primary residential parent of the Children. Mother also requested that she then be allowed to relocate with the Children. After a trial, the Trial Court declined either to make Mother the primary residential parent of the Children or to permit her to relocate with the Children. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Casey Renea Jeans, pro se appellant.

C. Dwaine Evans, Morristown, Tennessee, for the appellee, Jonathan Paul Gray.

# OPINION

## Background

In August 2005, Father filed a petition in the Trial Court to approve an agreed parenting plan, the PPP. The Trial Court granted Father's petition and approved the PPP. The PPP designated Father as the primary residential parent of the Children. Among other provisions, the PPP stated that the parents would rotate care of the Children every two weeks and neither parent would pay child support.

In April 2010, Mother filed her Petition for Contempt and to Modify Permanent Parenting Plan. Mother requested that she be designated the primary residential parent. Mother stated that in 2009, the Hamblen County General Sessions Court granted an Order of Protection to Tyler against Father that prohibited Father from using physical discipline against the Children. Among other allegations, Mother asserted that Father failed to provide the Children with appropriate medical care. Mother also filed a Notice of Intent to Relocate. Mother stated that she was to be married and her fiancé's home and employment were near Rutherford County. Mother noted that Orders of Protection against Father were set to expire in May and July of 2010 and that she could be in danger from Father.

Trial in this case was held in February 2011. First to testify was Mother. Mother lived in Russellville at the time of trial. Mother and Father never were married. Mother alleged that Father forced her to accept the 2005 PPP on his terms. Mother lived with Father from 2007 until May 2009 when she filed for an Order of Protection. Mother testified that Father called her a number of vulgar names over the course of their relationship and did so in front of the Children. Mother stated that Father struck Tyler with a belt and left bruises. Mother also stated that a reason for her filing for an Order of Protection was that Father grabbed Tyler by his throat and slung him onto a bed.

Mother claimed that, between 2007 and 2009, she, among other things, prepared meals for the Children and did their laundry. Mother testified that she had not worked outside the home after the Children were born and had last worked as a substitute teacher. Mother suffered vertebrae damage as a result of an injury during her stint as an athletic trainer. Mother received monthly disability payments.

Since 2009, Mother and Father shared custody of the Children on the basis of the original 2005 PPP. Mother's home had two bedrooms in which the Children each slept alone while Mother slept in the living room. Mother stated that she was engaged to be married.

Mother stated that Father engaged in abusive behavior towards her. Mother alleged that Father made a sexually suggestive comment about Mother to Alexia. Mother stated that sometimes when Father has the Children, they are at the home of Lori Camp, a friend of Father's. Mother testified that in the fall of 2010, she picked Tyler up and found that he had been wounded by a pellet gun. In October of 2010, Mother found out that, contrary to her wishes, Father had warts removed from Tyler's hand. Mother also testified that, sometime after the Order of Protection was entered, Alexia was returned to her with a high fever. Mother asked the Trial Court to make her the primary caretaker of the Children.

On cross-examination, Mother acknowledged that, in the two year period in which she lived with Father, she did not call the police over Father's alleged instances of abuse towards her. Mother also acknowledged that in 2010-2011, Tyler had earned all As and Bs, save for one C, in school. Mother also recognized that Alexia received no unsatisfactory marks in school. Regarding another disagreement with Father about medical decisions concerning Tyler's apparent seizures, Mother acknowledged that one MRI on Tyler yielded a negative result. Mother acknowledged spending time at a shopping area and having meals with Father in 2010. Mother stated that her current fiancé, Scottie Wilde, was the fourth man she had planned possibly to marry, though she stated that he was the only one she was "serious" about.

Christy Dalton ("Dalton"), a friend of Mother's, testified. Dalton supervised visits of the Children with Father based on the Order of Protection of 2009. Dalton testified regarding an incident where Tyler allegedly was left without adult supervision near a road while Father and Lori Camp went out. Dalton testified that while she had not seen the Children play with air guns, she had collected air pellets in her yard.

Cheryl Jeans ("Jeans"), Mother's mother, testified. Jeans stated that she saw Father smack Tyler in the mouth when Tyler was around five or six. Jeans also testified that Father called Mother vulgar names in front of the Children. Shanna Matthews, a close friend of Mother's, also testified that Father used foul language.

Wanda Gray ("Gray"), Father's mother, testified. Gray testified that her husband, Father, the Children, and two of her other grandchildren live in her home. Gray stated that Father spent time with the Children and assisted them with their schoolwork. Gray testified that she had not seen Father do anything that concerned her about his ability to take care of the Children. Gray acknowledged that the mobile home was crowded with seven inhabitants.

Father testified. Father stated that he worked at Overman, USA, an organization that makes furniture for IKEA. Father denied having grabbed Tyler by his

throat. Father further denied ever having forced Mother to have sex with him. Father acknowledged he once "back-handed" Mother after she hit him in the nose.

Regarding the Children, Father denied ever leaving them without adult supervision at Lori Camp's residence. Father also denied cursing the Children. Father stated that the Children had done well in Hamblen County schools and that it was his opinion that their relocation would be detrimental to the Children.

Father testified regarding his treatment of the Children:

Q.    Casey testified about an incident I think back in October of 2009 that she said an [sic] Ali had a temperature when you brought her back.

A.    Yes.

Q.    Had Ali been sick during the time you had her?

A.    She was running a temperature that morning of 101 and I give her some *Tylenol* but prior to that week she had a cold and I treated it with over-the-counter medicine.

Q.    But had you monitored her temperature during the time that you had her there for those days she had a cold?

A.    Yes.

Q.    And did it ever go above 101?

A.    No.

* * *

Q.    Has there ever been an occasion that you have inappropriately punished or spanked, used corporal punishment on your children?

A.    I discipline my children, yes. But not abuse them, or kick them, or slap in the face, or punch them or hit them. No I don't.

Q.    Have you hit them so hard by spanking them that you left marks on them?

-4-

A. No.

Q. Do you discipline them in any way that different than the way that you and Casey when you all lived together?

A. No.

Regarding medical treatment, and specifically Tyler's seizures, Father further testified, in part:

Q. And you and Casey have had some disagreements over medical issues for the children, right?

A. Yes.

Q. And under the Parenting Plan you all have joint decision making, so she has as much say so about medical as you do and you have as much as she does. You understand that?

A. Yes.

Q. And on the issues of the seizures, just tell us what your concerns were I guess when she first told you that Tyler had seizures.

A. Well she said he was having seizures and had took him to Dr. Dealey here in Morristown. And I think he had referred her ... referred Tyler on to Dr. Miller in ... Dr. Chris Miller in Knoxville. And they done an EEG and an MRI.

Q. Okay ...

A. The MRI came back negative. The EEG did come back abnormal.

Q. Okay ...

A. When she received the kids back she told me that Sunday that there was an appointment for Tyler to see Dr. Miller concerning treatment and how to go about it. And which I was unable to attend, cause twenty-four hours I mean, I just can't call into work and say I can't be at work because it wasn't an emergency. So I wasn't able to be at the doctor's

appointment. So I did not approve of the medication by just what I read in the report so I wanted to speak to the Doctor personally and I got ... November the 16th I got to.

Q.    Okay ...

A.    And I asked for a second opinion and I asked for a second EEG to be done. They did do a second EEG and it came back abnormal and we started him on medication.

Q.    I mean, did you just want to be involved in the decision making and be able to talk to the doctor directly yourself?

A.    Yes.

Q.    And once you were able to do that were you okay with the treatment that was being provided to him?

A.    Not until I got the second opinion. I wanted to ...

Q.    I mean, after you were able to get the second opinion and talked to the doctors?

A.    Yes after the second opinions and both were the exact same I called her that evening and talked to her after I left Dr. Mahmood ... well actually texted her and she called me and we discussed it and we agreed to start Tyler on *Keppra*. That's the medication that Dr. Miller had prescribed.

Q.    Does he take that medication when he's with you?

A.    Yes two times a day.

On cross-examination, Father acknowledged answering the phone as "Jon Gray's whore house," but not in front of the Children. Father admitted that he has cursed around the Children. Father acknowledged having left the Children at Lori Camp's residence at least once. Father denied that Lori Camp, who is married, was his girlfriend. Father denied putting marks on the Children or threatening Mother.

James Richard Camp, IV ("Camp") testified as a rebuttal witness. Camp was separated from his wife, Lori Camp. Camp testified that Father once told him that Father had

engaged in anal sex with Mother against her will. On cross-examination, Camp acknowledged that he believed Father had an affair with Lori Camp.

Mother testified as a rebuttal witnesses. Mother played audio tapes that purported to reveal Father cursing on the telephone near the Children in 2010. Another tape was played purporting to reveal Father making an alleged sexual statement about Mother.

After the trial, the Trial Court entered an order stating, in part:

1. The parties shall not curse, use profanity or call the other parent names in the presence of the children.

2. Father must show respect for Mother and he is prohibited from making any negative or derogatory comments about Mother on the telephone or otherwise.

3. The parent who has the children shall relay to the other parent appropriate information concerning medical treatments of the children and the parties shall mutually agree upon the course of treatment for a child, except in the case of an emergency; and in the case of an emergency the course of medical treatment for a child shall be made by that parent who has the child.

4. The children shall remain in the Hamblen County, Tennessee School System.

5. Except as specifically modified herein, the Permanent Parenting Plan entered by this Court on August 31, 2005 shall remain in full force and effect.

6. Except for the specific relief granted herein, Mother's Petition for Contempt and to Modify Permanent Parenting Plan is dismissed.

7. The costs of this cause are taxed one-half to Father and one-half to Mother, for which execution may issue if necessary.

Thus, apart from adding certain restrictions, the Trial Court kept the PPP as it existed and denied Mother's requested relief. Mother appeals.

## Discussion

Although Mother raises numerous issues on appeal, we perceive her appeal to be based on two fundamental issues, which we restate as follows: 1) whether the Trial Court erred in failing to find that a material change of circumstances existed which justified a change of the PPP; and, 2) whether the Trial Court erred in failing to permit Mother to relocate with the Children.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn.2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001).

We first address whether the Trial Court erred in failing to find that a material change of circumstances existed which justified a change of the PPP. Existing custody arrangements are favored because children thrive in stable environments. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). A custody decision, once made and implemented, is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, our Supreme Court has held that a trial court may modify an award of child custody "when both a material change of circumstances has occurred and a change of custody is in the child's best interests." *Kendrick v. Shoemake*, 90 S.W.3d 566, 568 (Tenn. 2002). According to the *Kendrick* Court:

> As explained in *Blair [v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002) ], the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id*. at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id*. (citations omitted).

*Kendrick*, 90 S.W.3d at 570. *See also* Tenn. Code Ann. § 36–6–101(a)(2)(B) (2010).

-8-

The *Kendrick* Court went on to explain that if a material change in circumstances has been proven, "it must then be determined whether the modification is in the child's best interests ... according to the factors enumerated in Tennessee Code Annotated section 36–6–106." *Kendrick*, 90 S.W.3d at 570 (footnote omitted). It necessarily follows that if no material change in circumstances has been proven, the trial court "is not required to make a best interests determination and must deny the request for a change of custody." *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999).

Mother requested that she be designated the primary caretaker of the Children. Mother, in her brief, argues as evidence of a material change of circumstances the following: "medical neglect, living arrangement of Father, abuse, stability, use of profanity by Father around children, violations of the Permanent Parenting Plan, and Mother's engagement." After a careful review of the record[1], including all of the evidence presented at trial, we cannot conclude that the Trial Court erred in failing to find that a material change of circumstances existed which justified a change of the PPP.

With respect to medical neglect, the record reveals rather reasonable differences of opinion between Mother and Father as to medical care. Father's living arrangement with his parents, while apparently somewhat cramped, does not constitute a material change in circumstances. The audio tapes purporting to demonstrate Father's vulgarity were inconclusive at best. With regard to Mother's engagement, we observe that Mother testified that she either has been engaged or considered marriage with four individuals, including the most recent. Respectfully, we do not find Mother's engagement to constitute a material change of circumstance.

Mother alleges that Father has abused her and the Children. Abuse, emotional or physical, would indeed affect the Children's well-being and be a significant basis for finding a material change of circumstances. Father denied any abuse, however, and his parents testified to having seen no abuse. Faced with conflicting accounts of abuse, we are left with the judgment of the Trial Court, which, while denying Mother's requested relief, made no specific finding as to abuse. The Trial Court's implicit finding, however, was a clear rejection of Mother's abuse contentions.

We normally do not second guess a trial court's credibility determinations as to a witness who testified before the trial court. As our Supreme Court has instructed:

---

[1]The record contains depositions of Mother and Father. While these depositions were referenced at times at trial, the depositions as a whole never were used by the parties at trial in a manner as permitted by Tenn. R. Civ. P. 32.01. We did not consider these depositions in reaching our judgment. We did, however, review the depositions, and we note that they would not have altered our Opinion.

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). The evidence in the record does not preponderate against any of the the Trial Court's findings, including its implicit finding. As we affirm the Trial Court's finding and decision that no material change in circumstances has occurred, we forego a best interest analysis.

We next address whether the Trial Court erred in failing to permit Mother to relocate with the Children to the Middle Tennessee area. As the parents in this case spend substantially equal time with the Children per the PPP, the applicable statute is Tenn. Code Ann. § 36-6-108 (c)[2], which provides:

> (c) If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child, the other parent may, within thirty (30) days of receipt of notice, file a petition in opposition to removal of the child. No presumption in favor of or against the request to relocate with the child shall arise. The court shall determine whether or not to permit relocation of the child based upon the best interests of the child. The court shall consider all relevant factors including the following where applicable:
>
> (1) The extent to which visitation rights have been allowed and exercised;
>
> (2) Whether the primary residential parent, once out of the jurisdiction, is likely to comply with any new visitation arrangement;
>
> (3) The love, affection and emotional ties existing between the parents and child;
>
> (4) The disposition of the parents to provide the child with food, clothing,

---

[2]The parties do not dispute this standard.

-10-

medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(5) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(6) The stability of the family unit of the parents;

(7) The mental and physical health of the parents;

(8) The home, school and community record of the child;

(9)(A) The reasonable preference of the child if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(10) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and

(11) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

Tenn. Code Ann. § 36-6-108 (c) (2010)

Based on the record before us, we are unable to conclude that the Trial Court erred in denying Mother's request to relocate the Children to Rutherford County. The evidence shows that the Children are well-established in their community and school in Hamblen County. Although Mother testified that she intends to marry her fiancé, as discussed above, we note that she testified to having had several tentative engagements to marry in the past, and did not marry. Further, in keeping with the statutory factors and mindful of the Children's best interests, we afford much weight to stability and continuity in the Children's lives, including the Trial Court's decision now affirmed by us that Father remain the primary residential parent. The Trial Court did not err in denying Mother's request to relocate the Children. We affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Casey Renea Jeans, and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE